IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN HAMILTON,<br><br>         *Plaintiff*,<br><br>    v.<br><br>CITY OF PHILADELPHIA, et al.,<br>         *Defendant*. | CIVIL ACTION<br>NO. 18-05184 |

PAPPERT, J.                                                                      September 5, 2019

**MEMORANDUM**

      Shawn Hamilton, an African-American woman, works for the City of Philadelphia as a police officer. She sued the City and Philadelphia Police Sergeant Robert Ryan, who is white, for creating a hostile work environment and discriminating against her due to her race and gender. The City and Ryan separately move to dismiss Hamilton's First Amended Complaint for failure to state a claim. The Court grants the City's Motion in full and Ryan's Motion in part, with leave allowing Hamilton one final opportunity to amend her *Monell* claim against the City and her claims against Ryan in his official capacity.

I

      Ryan commands the Police Department's recruitment unit, which recruits, hires and promotes police officers. (First Am. Compl. ¶ 9, ECF No. 10.) In 2016, Hamilton interviewed for a position in Ryan's unit. (*Id.* at ¶ 10.) Hamilton remembers the interview as follows: Rather than ask her questions, Ryan remarked "that he did not need anymore [sic] black females in his unit." (*Id.* at ¶ 11.) He also complained about how his predecessor, "a black female," had run the unit. (*Id.*) Ryan then warned

1

Hamilton "that if she had any type of attitude" or failed to recruit at least five new police officers each week, "he would have her kicked out of the department." (*Id.* at ¶¶ 12–13.) After these warnings, Ryan opined that all police "shootings involving minorities [were] justified." (*Id.* at ¶ 14.) The interview disturbed Hamilton to the extent "that she wrote a memo and sent it to [the] Vice President of [the police union]," who then gave it to the Police Commissioner. (*Id.* at ¶¶ 15, 16.) Though the Police Department initiated an internal affairs investigation into Hamilton's claims, to her knowledge, the Department took no action on her complaints. *See* (*id.* at ¶ 17.)

Some six months after her interview, Hamilton joined Ryan's unit. *See* (*id.* at ¶ 20.) Hamilton says that she discovered that Ryan had made similar "racially and sexually discriminatory remarks" to other "black and Hispanic officers." (*Id.*) She likewise claims that the recruiting quota Ryan had warned her about during the interview did not exist but was merely a way for Ryan "to intimidate her." (*Id.* at ¶ 22.) Hamilton adds that, even though several were available, "Ryan refused to give [her] a cubicle" for over a month. (*Id.* at ¶¶ 23–24.)

Over time, life under Ryan's command did not improve for Hamilton. *See* (*id.* at ¶ 19.) She alleges that Ryan limited her overtime hours while giving those hours to less senior white male officers. *See* (*id.* at ¶¶ 26–29.) Ryan also supposedly ordered Hamilton—"as a joke"—to inquire about holding a recruitment event "at the African American Museum," (*id.* at ¶ 31), and sent her to an event in the suburbs without a partner, (*id.* at ¶ 32.) On top of this, she alleges that Ryan refused to consider her request for vacation time. (*Id.* at ¶ 33.)

Eventually, Hamilton sued the City and Ryan in state court. After the City and Ryan removed the suit to federal court, they moved to dismiss Hamilton's complaint. *See* (Mem. in Supp. of Defs.' Mot. to Dismiss, ECF No. 6.) In response, Hamilton amended her initial pleading as a matter of course. Fed. R. Civ. P. 15(a)(1).

In her First Amended Complaint, Hamilton brings three counts against the City and Ryan. *See* (First Am. Compl. ¶¶ 40–58.) Count I alleges that Ryan created a hostile work environment and discriminated against Hamilton due to her race and gender. *See* (*id.* at ¶¶ 40–53.) This conduct, Hamilton says, violated her rights under § 1981 and is actionable through § 1983. *See* (*id.* at ¶¶ 41–42.) In Count II, she claims that the City is liable for the harm flowing from Ryan's conduct by developing and maintaining "polices, practices, procedures and customs exhibiting deliberate indifference" to her rights. (*Id.* at ¶¶ 54–56.) Although Hamilton asserted a stand-alone hostile-work-environment claim in Count III, she has since withdrawn that claim. *See* (Omnibus Resp. to Defs.' Mots. to Dismiss p. 15, ECF No. 22.)

II

To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough facts for the Court to infer "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Though this "plausibility standard is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Assessing plausibility under *Twombly* and *Iqbal* is a three-step process. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The first step is to

3

"take note of the elements the plaintiff must plead to state a claim." *Id.* (alterations omitted) (quoting *Iqbal*, 556 U.S. at 675). Next, the Court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, for all "well-pleaded factual allegations, the court should assume their veracity," draw all reasonable inference from them "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (alterations omitted) (quoting *Iqbal*, 556 U.S. at 679). If the well-pleaded facts do not nudge the "claims across the line from conceivable to plausible," the Court must dismiss the complaint. *Twombly*, 550 U.S. at 570.

### III

As explained below, the Court dismisses Hamilton's claims against the City because she fails to plead any factual basis for municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). For the same reason, the Court dismisses the claims against Ryan in his official capacity. But because Hamilton states plausible hostile-work-environment and racial discrimination claims against Ryan in his individual capacity, the Court denies Ryan's Motion to Dismiss those claims.

### A

A plaintiff may pursue a § 1983 claim against a municipality under two theories. *See Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). Her first option is to allege "that an unconstitutional policy or custom of the municipality led to . . . her injuries." *Id.* This theory requires the plaintiff to identify a particular "unconstitutional municipal policy or custom." *Id.* A municipal policy is an official proclamation, policy, or edict" issued by a municipal employee with "final authority" over policymaking. *Id.* A

4

municipal custom, by contrast, is "a given course of conduct, although not specifically endorsed or authorized by law, [that] is so well-settled and permanent as virtually to constitute law." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). Pointing to an unconstitutional policy or custom is not enough, though. "A plaintiff must also allege that the policy or custom was the 'proximate cause' of [her] injuries." *Id.*

The second viable theory of municipal liability requires a showing that the plaintiff's injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Forrest*, 930 F.3d at 105 (quoting *Estate of Roman*, 914 F.3d at 798). To state a claim under this theory, a plaintiff must allege "deliberate indifference on the part of the municipality." *Id.* at 106. Deliberate indifference has three components: that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.*

Hamilton fails to state a claim for municipal liability under either theory. For starters, she identifies no unconstitutional City policy or custom that caused her injuries. Rather, her complaint focuses entirely on Ryan's individual conduct. *See, e.g.*, (First Am. Compl. ¶¶ 23–25.) Hamilton never alleges that Ryan has "final authority" to issue municipal policy or that Ryan's conduct is part of a municipal custom "so well-settled and permanent as virtually to constitute law." *Estate of Roman*, 914 F.3d at 798. To the contrary, she notes that the City investigated her allegations regarding Ryan's conduct during her interview. (First Am. Compl. ¶ 17.) When Hamilton went

5

"above Ryan's rank," the Captain "approved [her vacation request] right away." (*Id.* at ¶ 33.)

Her deliberate-indifference theory fares no better. In fact, it is unclear whether Hamilton even alleges that the City caused her injuries through a failure or inadequacy amounting to deliberate indifference. To be sure, the words "deliberate indifference" appear in the Complaint. *See, e.g.*, (First Am. Compl. ¶ 55.) But Hamilton's *Monell* claim ostensibly turns entirely on the City's supposed policies or customs, not on any failure or inadequacy by the City.[1] *See* (*id.*)

Even if Hamilton does pursue a deliberate-indifference theory of liability, she lacks well-pleaded facts to support her conclusory assertion that the City acted "with deliberate indifference to [her] statutory and constitutional rights." (First Am. Compl. ¶ 53.) Though Hamilton states that "nothing [was] ever done about" other unnamed officers' complaints about Ryan's "racially and sexually discriminatory remarks," she never links the City's supposed inaction to any constitutional or statutory violation she endured. (*Id.* at ¶¶ 20–21.) Similarly, although she claims that a municipal decisionmaker knew of Ryan's conduct during the interview, she states that the City investigated that conduct. *See* (*id.* at ¶ 17.) In sum, Hamilton fails to plead that a failure or inadequacy amounting to deliberate indifference on the City's part caused her alleged injuries. *Cf. McTernan v. City of York*, 564 F.3d 636, 658–59 (3d Cir. 2009) (affirming dismissal of *Monell* claim supported by only conclusory allegations).

At bottom, Hamilton tries to do what *Monell* forbids—hold the City "liable under § 1983 for the acts of [its] employees." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d

---

[1] In her response to the Motions, Hamilton never mentions the deliberate-indifference theory, suggesting that she never intended to raise it. *See* (Omnibus Resp. to Defs.' Mots. to Dismiss at 15.)

6

165, 174 (3d Cir. 2017). For that reason, the Court dismisses all claims against the City. And because a suit against a municipal employee in his official capacity "is, in all respects other than name, to be treated as a suit against the [municipal] entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), the Court likewise dismisses the claims against Ryan in his official capacity. *See Barna v. Bd. of Sch. Dirs. of Panther Valle Sch. Dist.*, 877 F.3d 136, 150 n.11 (3d Cir. 2017) (noting that the same analysis for a claim against municipality "applies to the individual officials, as sued in their official capacities").

B

Only the hostile-work-environment and discrimination claims against Ryan in his individual capacity remain. *See* (First Am. Compl. ¶¶ 40–53.) The Court assesses these claims in two steps. First, the Court determines that Hamilton's hostile-work-environment and discrimination claims are cognizable under §§ 1981 and 1983. Second, the Court concludes that—at this stage—Hamilton has stated plausible claims.

1

Hamilton invokes §§ 1981 and 1983 as the sole legal bases for her claims against Ryan. *See* (*id.* at ¶¶ 41–42, 44, 51.) The former provision confers to "all persons within the jurisdiction of the United States" an equal right "'to make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (quoting 42 U.S.C. § 1981). Section 1983, however, "does not confer any substantive rights." *Williams v. Pennsylvania Human Relations Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017). Rather, it is "a method for vindicating federal rights elsewhere conferred." *Id.* (quoting *Hildebrand v. Allegheny Cty.*, 757 F.3d 99, 104 (3d Cir. 2014)). So by relying on §§ 1981 and 1983, Hamilton's hostile-work-environment and discrimination

7

claims aim to vindicate her § 1981 right to make and enforce contracts without respect to race through a cause of action under § 1983.

Hamilton concedes that "section 1981 applies to race only." (First Am. Compl. ¶ 41.); *see also Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). And § 1983 "does not confer any substantive rights." *Williams*, 870 F.3d at 297. Lacking an independent constitutional or statutory basis to sustain them, Hamilton's "complaints of gender discrimination . . . are not cognizable" under §§ 1981 and 1983. *Carvalho-Grevious*, 851 F.3d at 257. Thus, the Court dismisses the gender-based claims with prejudice.

Ryan argues that the Court must also reject the race-based claims. *See* (Ryan's Mot. to Dismiss pp. 4–6, ECF No. 19.) On his reading, *Williams v. Pennsylvania Human Relations Commission*, 870 F.3d 294 (3d Cir. 2017), held that plaintiffs may not use § 1983 to vindicate claims governed by Title VII. The Third Circuit rested that holding, Ryan says, on the notion that allowing plaintiffs to pursue Title VII claims through § 1983 would let them evade Title VII's statutory requirements and thus thwart Congress's "carefully crafted administrative scheme." (*Id.* at 5 (citing *Williams*, 870 F.3d at 299).) As Ryan notes, Hamilton's hostile-work-environment and racial discrimination claims fall within Title VII's ambit, but rather than "pursuing her statutorily prescribed administrative remedies," Hamilton attempts to use § 1983 as a vehicle for her Title VII claims. (*Id.*) He asserts that such efforts "to 'back door'" Title VII claims via § 1983 are precisely what *Williams* forbade and must therefore be "summarily rejected." (*Id.* at 6.)

*Williams*'s holding that plaintiffs cannot bring Title VII claims via § 1983 is inapposite. The plaintiff there based "her § 1983 claims solely on violations of Title VII." *Williams*, 870 F.3d at 300 n.34. It was this naked effort to evade that Title's requirements that the Third Circuit reasoned "would thwart Congress's carefully crafted administrative scheme." *Id.* at 299. But Hamilton does not assert a pure Title VII claim; she alleges the Ryan violated her § 1981 rights. *See* (First Am. Compl. ¶ 41.) Admittedly, the rights guaranteed by § 1981 closely resemble those in Title VII. Nevertheless, § 1981 and Title VII "are separate, distinct, and independent." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 461 (1975). For instance, while "Title VII offers assistance in investigation, conciliation, counsel, waiver of court costs, and attorneys' fees," § 1981 offers no such assistance. *Id.* at 460. Likewise, § 1981 permits "claims against individual supervisors," but Title VII does not. *Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001). And unlike Title VII, § 1981 lacks any administrative prerequisites to suit. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989), *superseded by statute on other grounds as stated in CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008); *Johnson*, 421 U.S. at 460 ("Congress did not expect that a § 1981 court action usually would be resorted to only upon completion of Title VII procedures."). A § 1981 claim is a valid and independent claim that a plaintiff may properly bring via § 1983. For that reason, Hamilton may bring her § 1981 claims through § 1983 notwithstanding any noncompliance with Title VII's administrative requirements.

2

That Hamilton may bring her § 1981 claims via § 1983 does not, however, mean that she has stated a plausible claim for relief. Again, she advances two claims against

9

Ryan—a hostile-work-environment and a racial discrimination claim. Taking her allegations as true and drawing all reasonable inference in her favor, the Court concludes that Hamilton has nudged these claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

i

To state a hostile-work-environment claim, Hamilton must satisfy five elements. She must plausibly allege that: (1) she endured "intentional discrimination" because of her race; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected [her]"; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances"; and (5) "the existence of *respondeat superior* liability." *Castleberry v. STI Grp.*, 863 F.3d 259, 262 (3d Cir. 2017). This last element turns "on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "If the harassing employee is the victim's supervisor and the harassment "culminates in a tangible employment action," the employer is strictly liable. *Id.*

Hamilton states a plausible hostile-work-environment claim. She says that Ryan made racist statements, *see* (*id.* at ¶¶ 11, 14), denied her overtime hours while giving those hours to less senior white officers, *see* (*id.* at ¶¶ 26–29), and forced her to inquire about holding a recruitment event at the African American museum "as a joke," (*id.* at ¶ 31.) Hamilton states that Ryan is "the head of the Police Recruitment Department," (*id.* at ¶ 9), that he threatened to have her "kicked out" of the unit and even the department, (*id.* at ¶¶ 12, 14), and that his harassment resulted in her receiving fewer overtime hours, (*id.* at ¶¶ 26–29.) *Cf. Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 219–20 (3d Cir. 2017) (recognizing that reduced hours can

constitute a tangible employment action). At this stage, these allegations satisfy the elements of a hostile-work-environment claim.

ii

To state a racial discrimination claim under § 1981, Hamilton must allege that (1) she "belongs to a racial minority," (2) Ryan intended to discriminate against her because of her race, and (3) the discrimination concerned "one or more of the activities enumerated in § 1981." *Castleberry*, 863 F.3d at 266 (quoting *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010)).

Hamilton states a *prima facie* claim for racial discrimination. She alleges that she is a racial minority. *See* (First Am. Compl. ¶ 4.). The allegations discussed above, *see, e.g.*, (*id.* at ¶¶ 11, 14, 26–29, 31), evince Ryan's intent to discriminate against Hamilton because of her race. And Hamilton's assertion that Ryan tried to "intimidate her" during the interview, (*id.* at ¶ 22), deprived her of a cubicle, *see* (*id.* at ¶¶ 23–24), denied her overtime hours, *see* (*id.* at ¶¶ 26–29), and refused to consider her request for vacation time, *see* (*id.* at ¶ 33), relate to activities protected in § 1981—namely, making and enjoying the benefits of her employment contract.

IV

"[I]n civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). Under Federal Rule of Civil Procedure 15(a), "courts may grant . . . amendments 'when justice so requires.'" *Frasher v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2004) (quoting Fed. R. Civ. P. 15(a)(2)). The Third Circuit has instructed district courts to grant leave to

amend the complaint and cure a deficiency, even if the plaintiff has not moved to amend the complaint.[2] *See Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000). Accordingly, the Court grants Hamilton one last chance to amend her Complaint consistent with this Memorandum and as specified in the attached Order.

An appropriate Order follows.


BY THE COURT:


***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.

---

[2] Hamilton has not explicitly moved for leave to amend. But in her omnibus Response to the Defendants' Motions, she discusses the standard for doing so. *See* (Omnibus Resp. to Defs.' Mots. to Dismiss at 11–12.) The Court will err on the side of construing that discussion as a request for leave to amend should her claims be dismissed.