IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN HAMILTON, <br><br> *Plaintiff*, <br><br> v. <br><br> SARGENT ROBERT RYAN, <br><br> *Defendant*. | CIVIL ACTION <br> NO. 18-05184 |

**PAPPERT, J.**                                                                                     May 1, 2020

### MEMORANDUM

Shawn Hamilton, an African American woman, is a Philadelphia Police Sergeant. From early 2017 to late 2018, then-Officer Hamilton worked in the Recruitment Unit. Her supervisor during that time was Sergeant Robert Ryan, who is white. Hamilton sued Ryan under 42 U.S.C. §§ 1981 and 1983 for allegedly creating a hostile work environment and racially discriminating against her. Ryan moves for summary judgment on both claims. The Court denies the Motion.

I

In August of 2016, Ryan interviewed Hamilton for a position in the Recruitment Unit, which he led at the time. *See* (Ryan Statement of Facts ¶ 16, ECF No. 42-1). "The interview," Hamilton later recalled, "was just bizarre." (Resp. Opp'n Summ. J. Ex. A, at 15:14, ECF No. 43-5) (Hamilton Dep.). Ryan allegedly began by lamenting that "he didn't need any more black females" in the Unit because "[h]e already had enough." (*Id.* at 15:17–18.) He then threatened to leverage his friendship with higher-ups to have Hamilton "kicked out" of the Unit if she had "an attitude." (*Id.* at 15:18–22.) Hamilton would meet the same fate, Ryan supposedly continued, if she fell short of a

1

recruitment quota that Hamilton later learned did not exist. *See* (*id.* at 18:9–19:7, 122:16–20); (Resp. Opp'n Summ. J. Ex. B, at 14:12, ECF No. 43-6) (Ryan Dep.). In another *non sequitur*, Ryan blurted out that all police shootings of "unarmed black males" were justified and denied the existence of "racism in the Philadelphia Police Department." (Hamilton Dep. 20:7, 20:12–13.)

Ryan's comments distressed Hamilton.[1] *See* (*id.* at 29:17–30:12). Indeed, the experience was so "bizarre" that she left the interviewing wondering if she was "being pranked." (*Id.* at 30:5.) Although Hamilton "just dealt with the stress" from the interview for a while, she eventually reported Ryan's comments to a union representative. *See* (*id.* at 30:8–11). On the representative's advice, Hamilton sent the union a memorandum recounting the incident. *See* (*id.* at 30:11–32:3).

After receiving Hamilton's memorandum, Internal Affairs investigated Ryan's alleged comments. *See* (*id.* at 32:23–33:4); (Ryan Dep. 19:6–20:8). During the investigation, several officers recalled Ryan making other "racist remarks."[2] (Resp. Opp'n Summ. J. Ex. C, at 10:15, ECF No. 43-7) (Collier Dep.). Officer Shawneir Collier, for example, remembered Ryan joking about what a Hispanic officer would do if then-

---

[1] Ryan denies making these statements. *See* (Ryan Dep. 13:1–2, 14:9–10, 14:18–19, 16:8–9). The jury will decide whether to believe Ryan's or Hamilton's version of the interview. For now, however, the Court must view all facts in Hamilton's favor. *See Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).

[2] "[S]o-called 'me too' evidence in an employment discrimination case is neither *per se* admissible nor *per se* inadmissible." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)). Rather, its admissibility turns on how closely this "evidence is to the plaintiff's circumstances and theory of the case." *Id.*; *see also Caver v. City of Trenton*, 420 F.3d 243, 264 (3d Cir. 2005) (deeming racist comments made about others outside the plaintiff's presence to be relevant). Because Ryan fails to challenge the admissibility of his alleged racist remarks about other officers, *see* (Mot. for Summ. J. 14), the Court need not resolve whether Ryan's alleged remarks directed at other officers are admissible, *see* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

candidate Trump built a wall along the U.S.–Mexico border. *See* (*id.* at 10:16–22). Similarly insensitive comments came up in interviews with other officers in the Unit. *See, e.g.*, (Resp. Opp'n Summ. J. Ex. E, at 8:16–13:10, ECF No. 43-9) (Newsome-Middleton Dep.); (*id.* Ex. F, at 47:10–48:7, ECF No. 43-10) (Scott Dep.).

Despite the distressing interview and the ongoing investigation, Hamilton joined the Recruitment Unit—with Ryan as her supervisor—in early 2017. *See* (Ryan Statement of Facts ¶ 6). When Hamilton arrived, Ryan supposedly acted as if he had neither known nor approved of her transfer. *See* (Hamilton Dep. 14:18–15:10). This perceived hostility continued as Ryan refused to give Hamilton a cubicle for about six weeks. *See* (*id.* at 130:14–19); (Ryan Statement of Facts ¶ 83). According to Officer Collier, Ryan intentionally put boxes in an open cubicle to keep Hamilton from having it. (Collier Dep. 18:10–13.) Ryan, for his part, testified that no cubicles were available and denied knowledge of any boxes. *See* (Ryan Dep. 22:22–24:7).

In March of 2017, the Police Department reorganized and expanded the Recruitment Unit. *See* (Ryan Statement of Facts ¶¶ 5, 8); (Hr'g Tr. 19:2–20:16, 47:7–17, ECF No. 47). Staff Inspector Joseph Bologna helmed the revamped Unit, taking over or delegating several duties, such as assigning and approving overtime, that once belonged to Ryan. *See* (*id.*); (Hamilton Dep. 72:12–73:9); (Collier Dep. 25:7–18). But this transfer of authority took several months, and in the interim, Ryan controlled overtime assignments. *See* (*id.* at 46:19–47:4). Even after Ryan lost formal control over overtime, it appears that he still informally supervised overtime allocation and approval. *See* (*id.* at 21:4–7, 45:16–19); (Hamilton Dep. 63:24–64:9, 94:2–19, 97:9–98:7). *But see* (*id.* at 72:4–73:10) (Collier Dep. 25:13–22).

The new organizational structure did little to ease the racial animosity Hamilton felt Ryan directed at her.  According to Hamilton, Ryan restricted the quantity and quality of her overtime hours while giving preferential treatment to white officers.  *See* (Hamilton Statement of Facts ¶¶ 28–30, ECF No. 43-2); (Mot. for Summ. J. Ex. 11, ECF No. 42-2) (showing Hamilton's overtime hours were lower than many of her colleagues). Other officers in the Unit corroborated that Ryan had at times unfairly withheld overtime or desirable assignments from minorities.  *See* (Collier Dep. 27:6–21); (Scott Dep. 12:16–23).  *But see* (*id.* at 14:24–15:4).  Ryan also supposedly refused to approve Hamilton's request for vacation time, forcing her to "go above Ryan's rank" to get her request approved, which it ultimately was.  (Hamilton Statement of Facts ¶ 41.)  Then during the Philadelphia Eagles Super Bowl parade, Ryan allegedly lied to another of Hamilton's superiors about not knowing her location, implying that Hamilton "had done something wrong."  (*Id.* at ¶ 27); *see* (Hamilton Dep. 143:13–144:14).  Over another few days, Ryan sent Hamilton (but no other officer) to the scene of a fire four times— once during a snowstorm—for an eight-hour shift each time.  *See* (*id.* at 146:22–151:10); (Collier Dep. 31:9–14); (Ryan Dep. 33:9–35:8).  During Black History Month, he ordered Hamilton to ask the African American Museum for permission to set up a police recruitment table in the museum.  *See* (*id.* at 35:10–37:14); (Hamilton Dep. 21:17– 24:24).  Though the assignment offended her (and she told Ryan as much), Hamilton did as Ryan ordered.  (*Id.* at 21:24–22:4, 25:16–24.)  On another occasion, Ryan sent Hamilton to an event in the suburbs without her partner—against standard procedure.  *See* (*id.* at 145:1–146:11).

For this conduct over her twenty or so months in the Recruitment Unit, Hamilton sued Ryan for creating a hostile work environment and racially discriminating against her. *See* (First Am. Compl., ECF No. 10). She also sued the City of Philadelphia, but the Court dismissed those claims. *See* (Order ¶¶ 1, 4–5, ECF No. 24). Ryan now moves for summary judgment on the remaining claims. (Mot. for Summ. J., ECF No. 42.)

II

Summary judgment is proper if the movant proves that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). A fact is "material" if it may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A mere scintilla of evidence supporting the nonmoving party, however, will not suffice. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

At summary judgment, a court may consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387–88 & n.13 (3d Cir. 1999). In doing so, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may a court make

credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

### III
### A

To maintain a hostile-work-environment claim under 42 U.S.C. § 1981, a plaintiff must offer facts from which a reasonable juror could find that: (1) she endured "intentional discrimination" because of her race; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected [her]"; and (4) "the discrimination would detrimentally affect a reasonable person in like circumstances."[3] *Castleberry v. STI Grp.*, 863 F.3d 259, 262 (3d Cir. 2017). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Courts must therefore examine the record "as a whole," as opposed to focusing on individual incidents. *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001).

A reasonable juror could find that Ryan intentionally discriminated against Hamilton because of her race. Discrimination "is often simply masked in more subtle forms" as offenders "have learned not to leave the proverbial 'smoking gun' behind." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996). Facially neutral conduct often gets its discriminatory patina from offensive language a defendant has used about minorities generally or the plaintiff specifically. *See id.* at 1083. Such is the case here. Ryan allegedly proclaimed that "he didn't need any more

---

[3] When a plaintiff sues her employer, she must also show "the existence of *respondeat superior* liability." *Castleberry*, 863 F.3d at 262. This showing is unnecessary when, as here, the defendant is a supervisor or coworker. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986).

black females" in the Unit because "[h]e already had enough." (Hamilton Dep. 15:17–18.) He then threatened to use his connections to have Hamilton "kicked out" of the Unit if she had "an attitude." (*Id.* at 15:18–22.) For good measure, he opined that all police shootings of "unarmed black males" were justified. (*Id.* at 20:7–13.) A reasonable juror could infer from those statements that Ryan, biased against African Americans, intended to run Hamilton out of the Unit. One could also infer that Ryan acted on that intent by depriving Hamilton of a cubicle, interfering with her overtime and vacation hours, assigning her inappropriate or burdensome tasks and working to get her in trouble with superiors. Although a jury need not reach these conclusions, it could. That possibility is, for now, enough to satisfy the first element of a hostile-work-environment claim.

The same is true for the second element. The disjunctive severe-or-pervasive standard is met when the hostility effectively alters the plaintiff's "terms and conditions of employment." *Castleberry*, 863 F.3d at 264 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Whether a defendant's conduct does so turns on "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23)). Viewing the record in Hamilton's favor, a reasonable juror could find that Ryan's discrimination was pervasive. Ryan's alleged six-week scheme to deprive Hamilton of a cubicle, one might infer, impeded her work performance or acted as a type of mild humiliation. *See* (Hamilton Dep. 130:14–19); (Collier Dep. 18:10–13). Though the parties dispute Ryan's control of overtime

7

assignments, the record supports an inference that Ryan informally interfered with the quantity and quality of Hamilton's overtime for months at a time. *See* (*id.* at 21:4–7, 45:16–19); (Hamilton Dep. 63:24–64:9, 94:2–19, 97:9–98:7). Such recurring harassment cuts directly to terms and conditions of Hamilton's employment. The record also allows an inference that Ryan periodically—but persistently—tried to drive Hamilton out of the Unit with his other harassing conduct. *See, e.g.*, (*id.* at 21:17–24:24, 143:13–144:14, 145:1–146:11, 146:22–151:10); (Collier Dep. 31:9–14). All this taken together could lead a reasonable juror to find that Hamilton endured pervasive discrimination.

On the final two elements, Ryan fails to carry his burden in moving for summary judgment. It is his obligation to prove the "absence of evidence to support [Hamilton's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Ryan chose not to do so for the last two elements, (Hr'g Tr. 27:1–2), and the Court has no reason to question Hamilton's assertion that Ryan's harassment caused her emotional distress. *See* (Hamilton Dep. 144:22–24, 168:13–14, 183:23–24). Nor is there cause to doubt that Ryan's conduct would detrimentally affect a reasonable person in like circumstances. *Cf.* (Scott Dep. 28:13–34:24, 57:10–61:15) (recounting how Ryan's conduct upset him or might upset someone without his high threshold for tolerating off-color remarks); (Newsome-Middleton Dep. 9:3–24) (recalling telling Ryan to stop with his remarks because they might offend someone).

B

On a racial discrimination claim under § 1981, a plaintiff must show that (1) she "belongs to a racial minority," (2) the defendant intended to discriminate against her because of her race, and (3) the discrimination concerned "one or more of the activities enumerated in § 1981." *Castleberry*, 863 F.3d at 266 (quoting *Estate of Olivia ex rel.*

*McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010)).  In the employment context, a plaintiff must also show that she suffered an adverse employment action.  *See id.*  If the plaintiff makes these showings, the burden shifts "'to the employer to articulate some legitimate, nondiscriminatory reason' for the adverse employment action."  *Id.* at 263 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  As the burden swings back to the plaintiff, she must expose "the employer's stated reason for the adverse action [as] an excuse, or pretext, for why the action was actually taken."  *Id.*

Ryan does not dispute the first or third elements.  *See* (Mot. for Summ. J. 15).  Hamilton, as an African American, belongs to a racial minority.  And Ryan's alleged discrimination—namely, interfering with Hamilton's overtime hours, *see* (Hamilton Dep. 63:24–64:9, 94:2–19, 97:9–98:7)—concerns the "benefits, privileges, terms, and conditions" of Hamilton's employment, 42 U.S.C. § 1981.

On the second element, a reasonable juror could find that Ryan intended to discriminate against Hamilton because of her race.  Once again, Ryan's statements during the interview are uniquely probative of his intent.  *See* (Hamilton Dep. 15:17–22, 18:9–19:7, 20:7–13).  One could infer from those statements that he resented Hamilton because of her race, decided to drive her out of the Unit and then tried to do so through his later conduct.  *Cf. Aman*, 85 F.3d at 1082–83; *Ahmed v. Lowe's Home Ctrs. Inc.*, 346 F. App'x 816, 821 (3d Cir. 2009) (unpublished) (explaining that the outcome at summary judgment "may well have been different" had the defendant "used racially insensitive language" and thus provided evidence of racial animus).  At trial, Hamilton's and Ryan's credibility will determine whether the jury in fact reaches this

conclusion. But the Court cannot prejudge that credibility contest. *See Parkell*, 833 F.3d at 323.

The record, viewed in Hamilton's favor, also supports an inference that Hamilton suffered an adverse employment action. An adverse employment action is one "that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019) (quoting *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015)). For discrimination claims, only actions such as a reduction in pay, termination or suspension without pay are sufficiently adverse. *See Jones*, 796 F.3d at 326. Of Ryan's alleged conduct, only his interference with Hamilton's overtime hours fits this mold. *Cf. Stewart v. Union Cty. Bd. of Educ.*, 655 F. App'x 151, 158 (3d Cir. 2016) (unpublished); *Albright v. City of Philadelphia*, 399 F. Supp. 2d. 575, 586 (E.D. Pa. 2005). To be sure, Ryan denies that he formally or informally controlled Hamilton's overtime, and some evidence in the record supports this claim. *See* (Mot. for Summ. J. 16); (Ryan Statement of Facts ¶¶ 11–15, 31–54); (Collier Dep. 25:13–22); (Hamilton Dep. 72:4–73:10). But other evidence backs Hamilton's assertion that Ryan had authority to and did in fact restrict her overtime. *See* (*id.* at 63:24–64:9, 94:2–19, 97:9–98:7); (Hamilton Statement of Facts ¶ 28); (Collier Dep. 21:4–7, 45:16–19); (Mot. for Summ. J. Ex. 4) (memo empowering sergeants such as Ryan to approve limited overtime); (*id.* Ex. 11) (showing Hamilton's overtime hours to be lower than her colleagues'). The jury will have to resolve this dispute at trial. *See, e.g.*, *Easter v. Grassi*, 51 F. App'x 84, 87–88 (3d Cir. 2002) (unpublished). And because Ryan offers no alternative explanation for his alleged conduct, *see* (Hr'g Tr. 34:3–24), the jury, should

it conclude that he interfered with Hamilton's overtime, will also have to decide whether Ryan had a legitimate, nondiscriminatory reason for doing so.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.